UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.E. HARRIS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 595, et al.,<br><br>    Defendants. | Case No. 13-cv-05207-WHO<br><br>**ORDER DENYING EX PARTE PETITION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 3 |

C.E. Harris, Inc. ("CHI" or "HE/CHI") petitions for a temporary restraining order and preliminary injunction to enjoin defendants International Brotherhood of Electrical Workers, Local 595 ("IBEW") and National Electrical Contractors Association, Northern California Chapter ("NECA") from continuing with labor grievance proceedings against it until pending criminal proceedings against Calvin Harris ("Harris"), the owner and president of CHI, are resolved. CHI argues that (1) it is not subject to the grievance proceedings because it is not a party to a purported collective bargaining agreement ("CBA") between it and the defendants, and (2) evidence sought in the grievance proceedings may be disclosed to the Alameda County District Attorney's Office (the "DA"), which has charged Harris in a related matter, thereby implicating Harris's rights under the Fifth Amendment of the United States Constitution.

Based on the parties' briefs and argument, and for the reasons below, the *Ex Parte* Petition for Temporary Restraining Order and Preliminary Injunction is DENIED.

## BACKGROUND

**I.     THE PARTIES AND THE DISPUTE**

The National Electrical Contractors Association is an association of electrical contractors,

with a Northern California Chapter. Uno Decl. ¶ 2. It is a party to a CBA with the International Brotherhood of Electrical Workers, Local 595. Uno Decl. ¶¶ 1, 2. The CBA establishes a grievance and arbitration procedure to resolve issues arising from it, and IBEW and NECA representatives participate in a Tribunal and Labor-Management Committee to resolve disputes or alleged violations of the CBA. Uno Decl. ¶¶ 3, 5. Initially, a grievance will be submitted to a tribunal consisting of one representative each from IBEW and NECA. Uno Decl. ¶ 5. If the grievance cannot be resolved, it is presented to the Labor-Management Committee, consisting of two representatives each from IBEW and NECA. Uno Decl. ¶ 6. If the grievance still cannot be resolved, then the matter is referred to the Council on Industrial Relations for the Electrical Contracting Industry, a national body. Uno Decl. ¶ 7. The grievance procedure in the CBA is final and binding, regardless of which step in the process the grievance is upheld or denied. Uno Decl. ¶ 8. NECA "provides employers with a representative for any grievance and arbitration proceedings." Uno Decl. ¶ 8.

From 1988 to 1999, Harris was in the electrical contracting business as a sole proprietor. Kunst Br. Decl. Ex. D ¶ 3. On June 12, 1997, on behalf of Harris Electric ("HE"), he signed a "Letter of Assent to be bound by Inside Construction Agreement," a collective bargaining agreement between NECA and IBEW. Kunst Br. Decl. Ex. D ¶ 4; Uno Decl. ¶ 9, Ex. B.

On December 18, 1998, Harris incorporated CHI. Kunst Br. Decl. ¶ 3, Ex. A. Harris is the president of CHI. Kunst Br. Decl. Ex. D ¶ 1. Harris "ceased operating as a sole proprietorship and conducted all of [his] business through [CHI]."[1] Kunst Br. Decl. Ex. D ¶ 5. On May 14, 1999, Harris had his contractor's license reissued to CHI. Kunst Br. Decl. Ex. D ¶ 6, Ex. B.

On March 2, 2004, Harris notified IBEW that he was terminating the CBA on behalf of HE, though he "indicated that [he] would be willing to negotiate a new agreement." No new agreement was executed. Kunst Br. Decl. Ex. D ¶ 8, Ex. D.

---

[1] The parties confusingly use the terms "Harris," "Harris Electric," "Harris Electric, Inc.," "C.E. Harris, Inc.," to refer to the business entity. Since Harris indicates that his business was operated after December 18, 1998, through CHI, the Court assumes that any reference to the business entity after that date is to CHI, but will generally use the nomenclature used by the parties. Unless otherwise indicated, Harris refers to Mr. Harris, not his company.

2

In 2006, IBEW filed a grievance against "Harris," though it is clear from Uno's declaration that he is referring to HE/CHI. Uno Decl. ¶ 32. The minutes from the grievance hearing makes clear that HE/CHI was being accused. Uno Decl. Ex. L. HE wrote to NECA to confirm that the matter was closed after it had paid the award. Uno Decl. Ex. M.

On March 22, 2012, IBEW filed a grievance with NECA against HE, alleging that HE breached a CBA by hiring non-IBEW workers.[2] Kunst Br. Decl. ¶ 5; Uno Decl. ¶ 10, Ex. C. On April 4, 2012, Don Campbell, Executive Director of NECA, and Victor Uno, Business Manager of IBEW, convened as a tribunal to adjudicate the liability portion of the grievance hearing. Kunst Br. Decl. ¶ 8; Br. 3; Uno Decl. ¶ 11. Samir Kharufeh and Daniel Chivello represented IBEW, and Harris and Pete Halver, a NECA representative, represented HE/CHI. Uno Decl. ¶ 12. The parties gave arguments and presented evidence. Opp'n 3. Harris "participated actively," arguing that Crisp and Lee "performed laborers work and/or helpers work rather than electricians work," and thus he was not obligated to hire IBEW workers. Uno Decl. ¶ 13; Opp'n 3. The tribunal relied upon the affidavits of Adam Crisp and Jason Lee, who worked as electricians for "Harris Electric."[3] Kunst Br. Decl. ¶ 8, Ex. F. Harris claims that CHI was never part of a collective bargaining agreement. Kunst Br. Decl. ¶ 6, Ex. D ¶ 9; Harris Reply Decl. ¶ 7. Nonetheless, IBEW's outside counsel determined that CHI was a party to the CBA, and CHI was found liable for failing to hire union employees as required by the CBA. Harris Reply Decl. ¶ 8, Ex. A.[4] The tribunal thereafter issued a Determination of Liability and Order, finding that CHI violated the CBA by failing to hire union workers.[5] Uno Decl. ¶ 14. CHI was then ordered to provide

---

[2] Although the grievance notification states that the grievance is against HE, the Kunst Declaration states that the grievance is against CHI.
[3] Kunst states in his Brief Declaration that Crisp and Lee "swear under penalty of perjury that they solely performed electrical work while they were employed by C.E. Harris, Inc.," and "declared that they did no work other than electrical work while they were employed by C.E. Harris, Inc.," citing to Exhibits F and G of his Declaration. Kunst Br. Decl. ¶¶ 8, 9. However, in his Motion brief, CHI argues that Crisp and Lee "swore that all of the work they performed for Harris, Inc.[,] was electrical work," but "less than two months later, Crisp and Lee signed different affidavits for the DA, stating only some of the work they did was electrical work." Br. 3.
[4] CHI has not provided the complete email as his exhibit, so the Court cannot determine the context.
[5] While the grievance document charges HE with violations, Uno Decl. Ex. C, the decision of the Tribunal was against CHI, Uno Decl. Ex. D.

3

documentation of past projects and employees to determine damages. Uno Decl. Ex. D. Uno claims that he does not recall Harris arguing that CHI was not bound by the CBA. Uno Decl. ¶ 31.

On February 27, 2013, a criminal warrant was issued against Harris. Kunst Br. Decl. ¶ 7, Ex. E. The information alleged in the warrant was discovered when employees of Harris were interviewed by a representative of IBEW. Kunst Br. Decl. Ex. E, Dkt. No. 6 at 38. On March 4, 2013, Harris was criminally charged in *People of the State of California v. Calvin Harris*, Dkt. No. 447810-4, pending before the Superior Court of California, County of Alameda. Silva Br. Decl. ¶¶ 3, 5. Harris was charged with 57 felony counts based on work that CHI performed for the County of Alameda. Silva Br. Decl. ¶ 5. A preliminary hearing is set for February 4, 2014, to determine whether there is sufficient evidence for the charges. Silva Reply Decl. ¶ 9; Silva Br. Decl. ¶ 4.

## II.   THE DAMAGES HEARING

On March 21, 2013, IBEW and NECA held another hearing to determine the amount of damages that CHI owed for violating the CBA. Br. 3; Kunst Br. Decl. Ex. J. CHI did not know about the meeting, did not attend, and did not present evidence in its own defense. Kunst Br. Decl. ¶ 15; Uno Decl. ¶ 15. The tribunal determined that CHI owed $1,180,619.98 in back wages and lost benefits. Kunst Br. Decl. Ex. J, Dkt. No. 6 at 68; Uno Decl. Ex. E. The damages were to be paid to IBEW and certain union benefit funds jointly administered by IBEW and NECA. Uno Decl. ¶ 16. The Determination of Damages and Award Order was served on CHI on June 21, 2013. Uno Decl. ¶ 16. The tribunal "ma[de] no claim or finding regarding whether Harris Electric submitted accurate Certified Payroll Reports to public agencies" or that "Harris Electric failed to pay prevailing wages on public work contracts." Uno Decl. ¶ 17. Rather, it was "limited solely to Harris Electric's failure to hire employees from the hiring hall, as required by the contract." Uno Decl. ¶ 17.

On June 25, 2013, IBEW filed a Petition to Confirm the April 4, 2012 Determination of Liability and Order, and the April 9, 2013 Determination of Damages and Award Order in the Superior Court of California, County of Alameda. Uno Decl. ¶ 18. CHI did not know about the damages hearing until IBEW filed the petition. Kunst Br. Decl. ¶¶ 11, 15. Harris claimed that he

4

heard nothing about the grievance from about June 2012 until he was served with IBEW's petition to confirm. Harris Reply Decl. ¶ 9. On August 22, 2013, the Superior Court issued a tentative decision granting the petition; the court also tentatively rejected the argument that CHI was not a party to the CBA. Uno Decl. ¶ 19, Ex. F. As part of the proceedings, Campbell filed a declaration stating that he believes that CHI "d/b/a Harris Electric" continues to be bound by the CBA. Uno Decl. ¶ 12, Ex. K. CHI gave notice of its intent to oppose the petition, arguing that it was never party to the CBA, that HE/CHI cancelled the CBA in 2004, "and that the meeting between NECA and IBEW did not constitute arbitration." Br. 3.

On August 23, 2013, Kyle Kunst, counsel for CHI, spoke with Campbell, who learned that the damages award incorrectly included work that occurred outside of Alameda County because the CBA excluded work outside the County. Kunst Br. Decl. ¶ 13. On August 26, 2013, at the hearing to confirm the arbitration award in the Superior Court, Campbell and Harris informed the judge that the tribunal had miscalculated damages. Kunst Br. Decl. ¶ 14. When the judge asked why this issue was not raised at the grievance proceedings, Kunst informed the judge that CHI was never informed that the hearing would take place. Kunst Br. Decl. ¶ 14. The judge deferred deciding whether to confirm the award and ordered the parties to submit declarations on the issue of whether CHI was informed that the damages hearing would occur. Kunst Br. Decl. ¶ 15; Uno Decl. ¶ 21. Both Harris and Campbell signed declarations stating that CHI had not been invited to the hearing, had not given evidence, and was unaware of any award until it was served with the petition to confirm the award. Kunst Br. Decl. ¶ 15, Ex. J.

Because of this development, IBEW withdrew its petition to confirm the arbitration award without prejudice, and a new Notice of Damages Phase Hearing and Order was issued to Harris and CHI on September 10, 2013. Uno Decl. ¶ 22, Ex. G. The tribunal set a new hearing for October 26, 2013,[6] ordering Harris to produce Crisp's and Lee's records and other documents so that it could determine any damages owed. Kunst Br. Decl. ¶ 16, Ex. J; Uno Decl. ¶ 23, Ex. G. CHI's attorney and Harris did not learn about the hearing until October 21, 2013. Kunst Reply

---

[6] Uno claims that the hearing was set for October 25, 2013. Uno Decl. ¶ 24.

5

Decl. ¶ 4; Harris Reply Decl. ¶ 10. On October 22, 2013, Greg Armstrong, NECA's representative to the tribunal on behalf of HE, requested that IBEW postpone the hearing because Harris's attorney was unable to attend and Harris was still gathering documentation. Uno Decl. ¶ 26. IBEW agreed and "set the next grievance proceeding for November 13, 2013." Kunst Br. Decl. ¶ 17; Uno Decl. ¶ 27, Ex. J. The same day, Kunst informed Campbell that he intended to file for a restraining order based on Harris's Fifth Amendment rights if the grievance proceedings moved forward while the criminal matter was pending. Kunst Reply Decl. ¶ 5, Ex. A.

On October 28, 2013, Kunst met with Campbell and others, asking whether IBEW would stay the proceedings, but IBEW said that it would not. NECA also said that it would move forward. Kunst Reply Decl. ¶ 7.

IBEW claims that "Harris" is still bound by the CBA as evidenced by the fact that: (1) Harris's website (www.harriselectric.com) prominently displayed the IBEW logo through at least November 15, 2013; (2) Harris asked IBEW on May 14, 2012, for a letter to Kaiser Permanente stating that "Harris electric" [sic] is still in good standing with IBEW; and (3) Harris continues to abide by CBA requirements, such as paying union wages and making contributions into union trust funds. Uno Decl. ¶¶ 35-37, Exs. N-S.

### III. THE CRIMINAL PROCEEDINGS

In July 2012, IBEW met with Harris to discuss settlement and provided him with sworn affidavits that Crisp and Lee had provided to the Alameda County DA. Kunst Br. Decl. ¶ 9. At the meeting, IBEW provided Harris with "SALT logs" completed by Crisp. Kunst Br. Decl. ¶ 10. SALT logs are given by IBEW to employees to "supervise" employers. Kunst Br. Decl. ¶ 10. Crisp began maintaining SALT logs in October 2011—five months before IBEW filed its grievance. Kunst Br. Decl. ¶ 10.

In the proceedings to confirm the award, Philip Monrad, an attorney for IBEW, stated in a declaration that the Alameda County DA had filed a criminal warrant alleging felony counts of public works wage fraud against Harris as the principal of C.E. Harris, Inc., which "are the subject of the grievance and arbitration award." Kunst Br. Decl. Ex. I.

On September 16, 2013, Harris's attorney in the criminal proceedings, Fatima Silva,

6

requested that NECA and IBEW stay the grievance proceedings because it would "greatly prejudice" Harris's criminal matter. Silva Reply Decl. ¶ 4, Ex. A. Silva believes that the bases for the allegations in the criminal complaint are contacts between IBEW and the Alameda County DA's office. Silva Decl. ¶¶ 6, 7. She claims that the DA's office is "diligently following" the grievance proceedings. Silva Reply Decl. ¶ 6. She has seen an IBEW representative speak with the Deputy DA at each criminal pre-trial hearing. Silva Reply Decl. ¶ 7. Silva asserts that the discovery sought in the grievance proceedings is identical to the discovery in the criminal matter, and thus any discovery sought by IBEW in the grievance proceedings would impinge on Harris's Fifth Amendment rights in the criminal matter. Silva Decl. ¶¶ 9, 10.

## PROCEDURAL HISTORY

On November 8, 2013, CHI filed a complaint and moved for a temporary restraining order and preliminary injunction. Dkt. Nos. 1, 3. On November 12, 2013, the Court held a telephone conference with the parties, during which the Court set a briefing schedule for the motion. Dkt. No. 14. The parties submitted their briefs, and on November 27, 2013, the Court heard arguments on the motion.

## LEGAL STANDARD

The analysis for granting a temporary restraining order is "substantially identical" to that for granting a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Alternatively, if the moving party can demonstrate the requisite likelihood of irreparable harm, and show that an injunction is in the public interest, a preliminary injunction may issue so long as there are serious questions going to the merits and the balance of hardships tips sharply in the moving party's favor." *Graham v. Am. Home Mortg.*, 13-cv-03322-

RS, 2013 WL 3989676, at *1 (N.D. Cal. Aug. 2, 2013) (citing *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  "[T]hese two alternatives represent extremes of a single continuum, rather than two separate tests.  Thus, the greater the relative hardship to the moving party, the less probability of success must be shown." *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 925 (9th Cir. 2003) (citation omitted).

## DISCUSSION

### I. WHETHER THE PARALLEL CRIMINAL PROCEEDINGS WARRANT A STAY

CHI argues that the Court should stay the grievance proceedings because information revealed in the proceedings may be passed on to the DA, thereby implicating Harris's Fifth Amendment rights.  "[T]he Fifth Amendment [provides a] privilege against compulsory self-incrimination." *Kastigar v. United States*, 406 U.S. 441, 444 (1972).  The privilege is against the government's ability to compel an individual to testify in a way that could lead to the individual's being criminally prosecuted.  *Id.* at 446.  Because our legal system provides for parallel criminal and civil proceedings, there may be a concern that parties can "use civil discovery as a pretext for gathering information useful for the criminal cases." *Golden Quality Ice Cream Co., Inc. v. Deerfield Specialty Papers, Inc.*, 87 F.R.D. 53, 57 (E.D. Pa. 1980) (Pollak, J.).  To prevent this, "a district court may stay civil proceedings pending the outcome of parallel criminal proceedings, [but] such action is not required by the Constitution." *Fed. Sav. & Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 902 (9th Cir. 1989).  Nonetheless, "a court should consider the extent to which the defendant's fifth amendment rights are implicated." *Id.*  In addition, a court may consider the following:

> (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation.

*Id.* at 903.  "A court must decide whether to stay civil proceedings in the face of parallel criminal

8

proceedings in light of the particular circumstances and competing interests involved in the case." *Id.* at 902.

A stay is not warranted in this case. Fundamentally, no Fifth Amendment rights are implicated. CHI, the sole plaintiff, is a corporation, and "it is well established that such artificial entities are not protected by the Fifth Amendment." *Braswell v. United States*, 487 U.S. 99, 102 (1988). Even if the grievance proceedings affect Harris, and not just CHI, the conclusion is the same. Harris—the individual who has been criminally charged—is not a party to the grievance proceedings or this case, and there is no basis for CHI to assert the potential infringement of Fifth Amendment rights on Harris's behalf. *See United States v. Judson*, 322 F.2d 460, 463 (9th Cir. 1963) ("Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation.").

But even if Harris were properly before the Court, Harris would not be able to invoke the Fifth Amendment to prevent disclosure of corporate documents that may incriminate him because the Supreme Court has made clear that "the privilege could not be employed by an individual to avoid production of the records of an organization, which he holds in a representative capacity as custodian." *Bellis v. United States*, 417 U.S. 85, 89 (1974). Having invoked the benefits of incorporation, Harris cannot now use them to shield him. The fact that Harris may be the only owner or officer of CHI does not matter because "[i]t is well settled that no privilege can be claimed by the custodian of corporate records, regardless of how small the corporation may be." *Id.* at 100.

In addition, the Fifth Amendment is not implicated because there is no state action. *Corrigan v. Buckley*, 271 U.S. 323, 330 (1926). This is not a situation in which the government has brought simultaneous civil and criminal proceedings against a defendant. Instead, private parties initiated the non-criminal proceedings. Indeed, those proceedings are not a "civil" case at all, but rather a purely private adjudication between private parties in a private forum arising from contractual rights. The tribunal, which is not a government entity, cannot *compel* CHI or Harris to do anything—any disclosure of information would be voluntary. It does not matter that Harris might face the "unpleasant choice" of either not testifying in the grievance proceedings to preserve

9

his Fifth Amendment rights or testifying and waiving those rights, but that is his choice to make. *See Int'l Bus. Machs. Corp. v. Brown*, 857 F. Supp. 1384, 1389 (C.D. Cal. 1994). The Constitution does not protect against inconvenient choices such as these even though CHI (and ultimately Harris) may stand to lose a not insignificant amount of money if it fails to participate in the grievance proceedings.

CHI argues that Harris's Fifth Amendment rights are implicated because there is a complete overlap between the criminal matter and the arbitration. Br. 7. IBEW seeks to learn the hours that Crisp and Lee worked since 2007 and a list of all CHI's current employees—the same information referenced in the criminal warrant. Br. 8. On the other hand, the defendants argue there is no significant overlap between the grievance and criminal proceedings: the grievance proceedings concern whether CHI violated the CBA by failing to hire IBEW electricians; the criminal proceedings concern whether Harris submitted falsified records and engaged in wage theft. Opp'n 16.

Even if there is complete overlap in the cases, and it is unclear that is necessarily true, the Court's conclusion would not be affected. CHI and Harris are not being compelled by the government to appear before the grievance tribunal—if they are concerned that divulging information could incriminate Harris, they can refuse to reveal anything. While there is no constitutional right to have civil proceedings stayed as criminal proceedings are ongoing, there is undoubtedly less of any cognizable right to stay private proceedings merely because damaging information could be released *voluntarily*.[7]

CHI relies on *United States v. Kordel*, 397 U.S. 1, 8-9 (1970), for the proposition that where a corporation's sole officer and shareholder may be implicated in a criminal action, postponing civil discovery is warranted. Reply 2. Of course, the Supreme Court did not decide that "troublesome question." *Kordel*, 397 U.S. at 9. But one significant difference between *Kordel* and this case is that the defendants there were being *compelled* to answer interrogatories in

---

[7] IBEW has offered to enter into a confidentiality agreement with CHI. Opp'n 14. CHI fears, however, that the DA has the authority to subpoena such evidence despite the confidentiality agreement.

civil discovery. That is not the situation here.

CHI argues that IBEW is a state actor "for purposes of the criminal complaint" because it is "[w]orking at [the DA's] behest and turning over evidence." Reply 3. "IBEW has continuously acted in concert with the DA" and "does not deny that the DA has been using it to obtain evidence." Opp'n 3 (citing *Murray v. Wal-Mart, Inc.*, 874 F.2d 555 (8th Cir. 1989); *Walker v. City of Hayward*, No. 07-cv-6205-TEH, 2008 WL 2357249, at *4 (N.D. Cal. June 6, 2008)). CHI points to the fact that the Crisp and Lee declarations used by the DA show that they were notarized by IBEW's receptionist, thus demonstrating collaboration between IBEW and the DA's office. Reply 3 (citing Kunst Reply Decl. ¶¶ 9-11). CHI also observes that Silva claims to see Kharufeh at Harris's pre-trial hearings. Reply 3 (citing Silva Reply Decl. ¶ 7).

Providing information to law enforcement officials does not make one a state actor. CHI's argument leads to the untenable conclusion that members of the public cannot give information about potential wrongdoing to the government without opening themselves up to charges of constitutional violations as state actors and that the government cannot use such information in criminal proceedings because the information is tainted by Fifth Amendment violations.

The cases cited by CHI are distinguishable. In *Murray v. Wal-Mart, Inc.*, 874 F2d 555 (8th Cir. 1989), which is not controlling authority, the Eighth Circuit held that the plaintiff had sufficiently shown that a security guard for the defendant was acting under the color of state law when he detained the plaintiff, pulled down her halter top, and baselessly prosecuted her for shoplifting. The court said that "state action is present when private security guards and police officers act in concert to deprive a plaintiff of his civil rights, particularly when a state statute authorizes a shopkeeper to detain suspected shoplifters." *Id.* at 559. There, a manager testified that "it is the practice of Wal-Mart to work with the police department in prosecuting shoplifters"; the security guard was "also an employee of the police department and has a close relationship with the prosecuting attorney, who apparently made his recommendation to prosecute based on Elliot's word, not upon an independent investigation of the facts"; and "the police and the prosecuting attorney relied on [the security guard's] incomplete version of the facts to justify detaining, searching, and prosecuting" the plaintiff." *Id.* Based on those facts, the court found

"ample evidence of willful, joint activity" sufficient to render the defendant a state actor. *Id.*

Here, the only allegations of state action are that IBEW has provided information to the DA and that an IBEW representative has appeared at pre-trial hearings and spoken with a deputy DA. There is no evidence that "it is the practice" of IBEW to work with the DA, that anyone from IBEW is employed by or even has a "close relationship" with the deputy DA, or that the DA is not conducting its own independent investigation and is only relying on IBEW's incomplete facts to bring a prosecution.[8]

Similarly, *Walker v. City of Hayward*, No. 07-cv-6205-TEH, 2008 WL 2357249, at *4 (N.D. Cal. June 6, 2008), is distinguishable. On a motion to dismiss, the court held that the plaintiff had adequately pleaded that a private security company acted under color of law by alleging that the police had a "customary policy" of arresting individuals based on reports made by the defendants, without conducting an independent investigation. *Id.* This case is distinguishable because CHI has provided no evidence that the DA is *not* performing its own independent investigation or that there is any "customary policy" between the defendants and the DA. The Court in *Walker* pointed out that "merely complaining to the police does not convert a private party into a state actor. Nor is execution by a private party of a sworn complaint which forms the basis of an arrest enough to convert the private party's acts into state action." *Id.* at *3 (quoting *Collins v. Womancare*, 878 F.2d 1145, 1155 (9th Cir. 1989)). But that is the precise basis for CHI's argument that the defendants are state actors.

The *Molinaro* factors do not sway the Court in favor of either party. Each one boils down to the same point. The defendants have an interest in concluding the grievance proceedings, which began in March 2012. Even NECA—which is supposed to represent CHI's interests—wishes to move forward. Kunst Reply Decl. ¶ 7. As the Ninth Circuit has recognized, "Arbitration is designed to settle labor disputes quickly, as they arise; much of its value is lost if it is stayed by a federal court." *Camping Const. Co. v. Dist. Council of Iron Workers*, 915 F.2d 1333, 1345 (9th Cir. 1990). On the other hand, there is no doubt that Harris (who is not a party

---

[8] Further, in *Murray*, the plaintiff was detained and prosecuted against her will. Here, CHI has the choice of not turning over its own information.

here) has an unpleasant choice to make, and its repercussions could be more significant than money alone. But because CHI does not have a Fifth Amendment right, because there is no state action, and because CHI has a choice of whether to participate in the grievance proceedings, the Court will not issue a stay simply because there is a criminal investigation against Harris.

## II. WHETHER INJUNCTIVE RELIEF IS APPROPRIATE

### A. The Norris-LaGuardia Act

The Norris-LaGuardia Act states, "No court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter." 29 U.S.C. § 101. "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113. The definition is "extraordinarily broad," and the Ninth Circuit has said that "there can be little doubt that under a literal reading of Norris-LaGuardia, the Act applies to [a] district court's stay of the arbitration proceedings" in a labor case. *Camping Constr.*, 915 F.2d at 1342-43.

"However, the Supreme Court has made it clear that the Norris-LaGuardia Act is not necessarily to be construed literally in all circumstances." *Id.* at 1343. "[I]n spite of what the Norris-LaGuardia Act says, the Supreme Court has held that federal courts *do* have jurisdiction to issue injunctions in *some* labor disputes, even in some of the circumstances covered by section 4's outright ban." *Id.*

The defendants argue that this case falls under the Norris-LaGuardia Act and that the ordinary injunction standard does not apply. Opp'n 1 (citing *Camping Constr.*, 915 F.2d at 143, 147). The Court lacks jurisdiction, the defendants assert, unless the requirements of 29 U.S.C. §§ 107-109 are met. Opp'n 5. They contend that the case grows out of a "legal dispute" as defined in 29 U.S.C. § 113, and that labor arbitration proceedings have been held to grow out of

13

1   "labor disputes." Opp'n 5 (citing *Camping Constr.*, 915 F.2d at 143, 147). A court has no

2   jurisdiction over a case where "an employer seeking to thwart grievance and arbitration

3   procedures claims it is not bound by the CBA." Opp'n 6.

4       CHI argues that the Norris-LaGuardia Act and Labor Management Relations Act

5   ("LMRA") conflict in this case and that the general preliminary injunction standard applies.

6   Reply 5. It cites to *Painting & Decorating Contractors Ass'n of Sacramento, Inc. v. Painters &*

7   *Decorators Joint Committee of the East Bay Counties, Inc.*, 707 F.2d 1067 (9th Cir. 1983)

8   ("*PDCA I*"), and 717 F.2d 1293, in which the court granted an injunction under the LMRA despite

9   the Norris-LaGuardia Act. Reply 5. In *PDCA I*, the Ninth Circuit held that the case did not

10  involve a "labor dispute" under the Norris-LaGuardia Act. Reply 5. Thus, CHI asserts that courts

11  are not necessarily deprived of all jurisdiction in labor disputes. Reply 5-6 (citing *Camping*

12  *Constr.*, 915 F.2d at 1348). CHI argues that the Court retains jurisdiction to enjoin this matter

13  under the LMRA. Reply 6 (citing *Schuck v. Gilmore Steel Corp.*, 784 F.2d 947 (9th Cir. 1986);

14  *LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Food Dist., Teamsters Local 63*, 849 F.2d

15  1236 (9th Cir. 1988). Finally, CHI claims that nowhere has IBEW asserted that this case involves

16  a "labor" dispute under the Norris-LaGuardia Act, Section 104. Reply 6.

17      The Court need not decide whether the Norris-LaGuardia Act bars the Court from issuing

18  an injunction because the Court concludes that CHI is not entitled to a temporary restraining order

19  or preliminary injunction in any event, as explained below.

20      **B. Likelihood Of Success On The Merits**

21      In determining whether CHI was subject to the CBA and grievance proceedings, the Court

22  "must simply apply the usual principles of contract law to the collective bargaining context." *Bay*

23  *Area Typographical Union, Union No. 21 v. Alameda Newspapers, Inc.*, 900 F.2d 197, 199 (9th

24  Cir. 1990). "[A]n employer has no obligation to arbitrate issues which it has not agreed to

25  arbitrate, so a fortiori, it cannot be compelled to arbitrate if an arbitration clause does not bind it at

26  all." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964). "The Supreme Court has

27  held that although a 'successor' employer may have a duty to bargain with the union recognized

28  by its predecessor, it is not bound by the substantive terms of its predecessor's CBA unless it

assumes or adopts those obligations." *Sheet Metal Workers Int'l Ass'n, Local No. 359, AFL-CIO v. Ariz. Mech. & Stainless, Inc.*, 863 F.2d 647, 651 (9th Cir. 1988). However, "[u]nder the alter ego or single employer doctrines, a non-signatory successor employer will be bound to the terms of its predecessor's CBA if the transaction transferring ownership to the successor is a sham designed to avoid the obligations of a CBA or if the entities comprise an integrated enterprise." *Id.* To determine whether those doctrines apply, "[t]he courts look to such factors as interrelationship of operations, common management, centralized control of labor relations, and common ownership." *Id.*

Here, based on the evidence before the Court, CHI has not shown that it is not bound by the CBA or subject to the grievance proceedings. There are simply too many negative facts and inconsistencies for CHI to make a "clear showing" that it is entitled to a preliminary injunction. To begin, CHI claims that Harris rescinded the CBA on behalf of "Harris Electric" on March 2, 2004. *See* Kunst Br. Decl. Ex. D. However, this was substantially after CHI was incorporated on December 18, 1998. Kunst Br. Decl. Ex. A. In the interim, Harris appears to have been operating both CHI and "Harris Electric," assuming Harris Electric was even a separate entity, as CHI appears to be arguing at times. Br. 2. Harris asserts that he "ceased operating as a sole proprietorship and conducted all of my business through [CHI]" as of CHI's incorporation. Kunst Br. Decl. Ex. D ¶ 5. If that is the case, and if only the sole proprietorship was subject to the CBA, Harris does not explain why—nearly six years later—he "notified IBEW [he] was terminating the CBA . . . [a]lthough [he] indicated [he] would be willing to negotiate a new agreement . . . ." *Id.* ¶ 8. In other words, CHI and Harris do not explain why the CBA was allegedly terminated so many years after CHI came into existence or on whose behalf Harris was "willing to negotiate a new agreement."

The evidence also shows that CHI's argument that it is not bound by the CBA is of recent vintage. At least one person present at the liability hearing states that he does not recall any objection that CHI was not subject to the CBA. Uno Decl. ¶ 31. Indeed, even Campbell—the Executive Director of NECA, which represents employers' interests and represented CHI's interests at the grievance proceedings—declared that "Harris Electric has never rescinded its

15

membership from [NECA] or rescinded its letter of assent to the CBA between [NECA] and [IBEW]," that he "know[s] of no attempt by Harris Electric to terminate its membership in [NECA]," and that his "understanding is that Harris Electric continues to be bound by the [IBEW] CBA." Uno Decl. Ex. K ¶ 4. And at the grievance proceedings, one witness said that Harris "participated actively," arguing that Crisp and Lee "performed laborers work and/or helpers work rather than electricians work," and thus he was not obligated to hire IBEW workers. Uno Decl. ¶ 13; Opp'n 3. If CHI actually thought that it was not a party to the CBA, it waited over a year after the liability hearing before raising the issue at the Superior Court confirmation proceedings in the summer of 2013 even though it could have filed for an injunction any time before then.

CHI's actions to date are consistent with its being bound by the CBA. In 2006—after the supposed termination of the CBA—CHI was subjected to a grievance proceeding, seemingly acquiesced to the tribunal's jurisdiction, paid a fine, and even wrote to confirm that it had satisfied the award, asking that the grievance be closed. Uno Decl. Ex. M; Opp'n 11. In 2012, Harris wrote to IBEW requesting a confirmation letter stating that CHI was "in good standing" with IBEW. Uno Decl. Ex. O. As the defendants argue, CHI binds itself to the CBA by its conduct. Opp'n 12 (citing *S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1133 (9th Cir. 2004); *Certified Corp. v. Haw. Teamsters & Allied Workers Local 996*, 597 F.2d 1269, 1272 (9th Cir. 1979)).

Harris says that he believed the 2006 grievance to be "based upon work performed by Sound & Communication Workers, which [he] believed to be different than the Inside Wire Agreement, the collective bargaining agreement which forms the basis of this dispute." Harris Reply Decl. ¶ 3. He told the tribunal this, but they never determined the issue. Harris Reply Decl. ¶ 4. Harris also argues that he wrote to IBEW to seek a letter confirming that CHI was in good standing based on the 9th District Sound & Communications Agreement of Northern California, another agreement managed by NECA and IBEW, not the CBA at issue here; for the same reason, CHI maintains the IBEW logo on its website. Harris Reply Decl. ¶¶ 5, 6.

Harris's arguments are uncorroborated at best. As the minutes to the 2006 proceedings state, the allegations there involved the "Alameda County Inside Construction Agreement between

1   [IBEW] and [NECA]." Uno Decl. Ex. L.  That is the title of the CBA at issue here.  Uno Decl.
2   Ex. A.  There is no basis for Harris's alleged belief that the 2006 proceedings were based on other
3   CBAs.  As for the good-standing letter and website logo, the Court cannot decide which way the
4   evidence weighs based on what is in the record, but it does not weigh in CHI's favor, as evidence
5   must for a preliminary injunction.

6       CHI argues that it has protested numerous times that CHI is not party to the CBA.  Reply
7   7.  It contends that Harris raised this issue during the grievance proceedings and that IBEW's
8   outside counsel determined that CHI was bound by the CBA, as evidenced by an email exchange.
9   Reply 7 (citing Harris Reply Decl. ¶ 8).  CHI asserts that the Superior Court tentatively concluded
10  that the CBA applied to CHI because the court based its decision on evidence that Uno cited in his
11  reply declaration, and thus CHI never had an opportunity to respond.  Reply 7.

12      These arguments, too, are hard to credit.  First, CHI has provided the Court with an
13  incomplete email chain so it is impossible to determine from the email exchange that CHI had
14  raised earlier the issue of whether it is bound by the CBA.  The Court cannot determine the
15  context of the exchange, and thus cannot credit it.  Second, the Superior Court stated that it relied
16  on more than just the Uno declaration to inform its decision—it cited to the petition, a declaration
17  from Harris, and an attachment to Harris's declaration as well.  Uno Decl. Ex. F.  CHI was
18  therefore on notice since the filing of the petition that the issue of the CBA's applicability was
19  raised to the court.  Even if the issue of whether CHI was bound by the CBA was not raised until
20  the reply, CHI could have and should have raised the issue in its opposition brief.

21      CHI itself admits, "Substantial questions remain regarding whether C.E. Harris, Inc. is
22  bound." Reply 7.  That is why CHI has not shown a likelihood of success on the merits.  CHI has
23  not provided the Court with sufficient evidence to meet its burden for seeking a preliminary
24  injunction.  The evidence it provides is inconclusive at best.  On the other hand, the defendants
25  have provided the Court with evidence that casts serious doubts on CHI's arguments.  On balance,
26  CHI fails to show that there are serious questions on the merits.

27      **C.  Irreparable Harm**
28      The Court does not find that CHI will suffer irreparable harm in the absence of a

preliminary injunction.  "[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award."  *Rent-A-Center, Inc. v. Canyon Tel. & Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir. 1991).  Here, the harm that CHI faces is purely monetary.  If it participates in the proceedings, it will have to turn over certain business documents and appear at the damages hearing for only a few hours, as the defendants represent.  Afterwards, any damages assessed would have to be confirmed by a court.  On the other hand, if CHI is seriously concerned about the possibility of turning over materials that may criminally implicate Harris, it may choose not to participate.  In any event, the potential harm to CHI is monetary, and thus not irreparable.

### D.  Balance Of Equities

The Court finds that the balance of equities does not weigh in CHI's favor.  CHI has known about the grievance proceedings since March 2012.  Yet it participated in the liability portion and failed to raise the issue of whether it is a party to the CBA in court until it was served with the petition to confirm the award in June 2013.  The Court takes judicial notice of the fact that the parties moved for dismissal of the Superior Court action on September 11, 2013.  But CHI waited nearly two months until a few days before the rescheduled damages hearing to file this case.  This weighs against granting an injunction.

On the other hand, there are potentially aggrieved members of IBEW who await resolution of the underlying matter.  While the defendants waited nearly a year before proceeding to the damages phase, further delay in the matter is not warranted.  This also weighs against granting an injunction.

CHI argues that the equities tip in its favor due to the possibility that information from the grievance process is being sent to the DA. Br. 6.  As the Court has acknowledged, CHI and Harris face an "unpleasant choice" of participating in the grievance proceedings and handing over potentially incriminating information or having damages assessed against it by the tribunal.  But the Court has already concluded that neither CHI nor Harris has any constitutional rights that are being infringed, and thus the unpleasantness of this choice is not a cognizable hardship or equity.

18

**E. Public Interest**

The Court finds that the public interest is not served by issuing an injunction. A court should "not grant a preliminary injunction [ ] unless those public interests [in favor of issuing the injunction] outweigh other public interests that cut in favor of not issuing the injunction." *Alliance for the Wild Rockies*, 632 F.3d 1127 at 1138. CHI argues that an injunction is in the public interest because it did not agree to this grievance process. As the Ninth Circuit observed, "federal labor policy strongly favors the resolution of labor disputes through arbitration." *United Food & Comm'l Workers Int'l Union, Local 588 v. Foster Poultry Farms*, 74 F.3d 169, 173 (9th Cir. 1995). While a party certainly should not be forced to arbitrate when it has never agreed to do so, here it is not clear that CHI withdrew from the CBA. The strong federal policy in favor of labor arbitration outweighs the mere possibility that CHI is no longer party to the CBA. CHI has identified no other interest in its favor.

## CONCLUSION

Because CHI has not shown that any Fifth Amendment rights are implicated in this case and that any of the preliminary injunction factors weigh in its favor, the motion for a temporary restraining order and preliminary injunction is DENIED.

**IT IS SO ORDERED.**

Dated: December 3, 2013

WILLIAM H. ORRICK
United States District Judge